UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| NEW YORK LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>DEAN TORRENCE, JEFFREY A. WILLEY, TRENT WELLBAUM, ALLEN WILLEY, CORY NASHTOCK,<br><br>Defendants. | 4:21-CV-04079-RAL<br><br><br>OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND MOTION FOR ATTORNEYS' FEES AND COSTS |

This case concerns the application of South Dakota's slayer statute, SDCL § 29A-2-803, to a life insurance beneficiary who assaulted the policy holder resulting in her death. Two of the decedent's children, Defendants Cory Nashtock (Cory) and Trent Wellbaum (Trent), have filed a motion for summary judgment arguing that SDCL § 29A-2-803 bars the life insurance beneficiary, Defendant Dean Torrence (Dean), from receiving the life insurance death benefit. New York Life Insurance Company (NYLIC), the plaintiff in Interpleader, has filed a motion for attorneys' fees and costs. For the reasons discussed, the motions are granted.

I.  **Facts and Procedural History**

The facts are drawn from the pleadings and affidavits of Plaintiff NYLIC and Defendants Cory and Trent. Dean has denied all of Cory and Trent's statements of undisputed material fact without providing any explanation or additional facts. Doc. 40 at 2.

1

Sherry Nashtock (Sherry), the decedent, had three adult children: Trent Wellbaum, Allen Willey (Allen), and Cory Nashtock. Doc. 32 at 2. She had married Defendant Jeffrey A. Willey (Jeffrey) and separated from him at some point before 2006, although it is unknown whether she and Jeffrey divorced. Doc. 32 at 2. Regardless, in 2006, Sherry began living with Dean and stayed with him until her death. Doc. 33-4 at 13; Doc 45-1 at 2.

Dean and Sherry had a troubled relationship with a history of domestic abuse. Doc. 33-5 at 28–29. Before she died, Sherry ran away from Dean several times to escape his beatings. Doc. 33-5 at 28–29. Sherry had serious alcohol issues and could become aggressive when drinking. Doc. 33-5 at 7–8; Doc. 45 at 3. During their relationship, Dean claims that Sherry hit him in the head with a fire extinguisher, stabbed him in the neck with a fork, and hit the back of his head with an ashtray. Doc. 33-5 at 8.

Sherry purchased life insurance policy A8865194 ("the Policy") from NYLIC in 2017 and made Dean the sole beneficiary. Doc. 32 at 1; Doc. 34 at 2. The Policy has a death benefit of $91,500.00 plus unearned premium and interest. Doc. 32 at 1; Doc. 34 at 2. The distribution provision of the Policy states as follows:

> The Death Benefit will be paid in equal shares to the first beneficiary(ies) who survives the INSURED by 15 days. If no first beneficiary(ies) so survives, payment will be made in equal shares to any second beneficiary(ies) who survives the INSURED by 15 days, and so on. Surviving beneficiary(ies) in the same class will have an equal share in the proceeds otherwise designated for a deceased beneficiary in that class. *If no beneficiary is designated or no beneficiary survives the INSURED, benefit will be payable to the INSURED's estate, or at OUR option to the INSURED's surviving relative(s) in the following order of survival: spouse or partner, as applicable; children equally; parents equally; or brothers and sisters equally.*

Doc. 32 at 7 (emphasis added). The Policy also has a forfeiture provision stating:

> No payment will be made to any person(s) if such person(s) is the principal or an accomplice in willfully bringing about the INSURED's death. Payment will be

2

>made in accordance with this section as though that person(s) had died before the INSURED.

Doc. 34 at 10.

Sherry died the week of September 20, 2020, three years after she purchased the Policy. Doc. 32 at 2. On the day she died, Sherry was intoxicated and drove a lawnmower about a mile from her and Dean's home down the highway.[1] Doc. 33-5 at 11. She stopped the lawnmower, entered the home of an acquaintance, and then passed out in bed. Doc. 33-5 at 11. The acquaintance called Dean and told him to come and pick Sherry up. Doc. 33-5 at 11. According to Dean, after he picked Sherry up and was driving her home, they began arguing. Doc. 33-5 at 36. Dean claims that Sherry jumped out of the pickup, and the two of them exchanged blows by the highway. Doc. 33-5 at 36. Eventually Dean pulled Sherry back inside the truck and drove the rest of the way home. Doc. 33-5 at 36.

Sherry was curled up on the floor of the truck when they arrived. Doc. 33-5 at 36. Dean claims that Sherry told him she would go inside the house in a few minutes, and he left her in the truck and went to bed. Doc. 33-5 at 36. A few hours later, Dean says he woke up and went to check on Sherry after he noticed that she had not come back inside. Doc. 33-5 at 36. He found her laying unresponsive beside the pickup and called the police. Doc. 33-5 at 20, 36. Dean was sobbing and attempting to give Sherry CPR when the officers arrived. Doc. 33-5 at 20–21. Several hours later, he told the officers that he had killed her. Doc. 33-5 at 40; Doc. 43 at 4.

Dean was indicted on twelve counts in state court including second-degree murder, manslaughter, aggravated assault, and simple assault. Doc. 32 at 3. He ultimately plead guilty to two counts of aggravated domestic assault. Doc. 33-2 at 4; Doc. 33-3 at 1–2; Doc. 33-4 at 9–11;

---

[1] Dean had also beaten Sherry on the day before her death. Doc. 33-5 at 29, 33.

Doc. 34 at 3. The factual basis to the plea agreement stated that Dean had beaten Sherry by backhanding, kicking, biting, and holding her down while he choked her and punched her face and head. Doc. 32 at 4; Doc. 34 at 3–4. Sherry had black eyes, purple ears, cuts behind her ears, bruises all over her face, missing teeth, bleeding from her mouth, bruises on her arms, hands, and torso from the beating, and bite marks on her torso and legs. Doc. 32 at 5; Doc. 33-5 at 31–32. Her death was ruled a homicide and the cause of death was listed as "subdural hemorrhage, blunt force injury of head, assault." Doc. 32 at 2; Doc. 34 at 2.

At Dean's sentencing hearing in October 2020, he admitted his guilt in open court and appeared "extremely remorseful" to the sentencing judge. Doc. 33-5 at 41; Doc. 43 at 4. The prosecutor argued that it was not clear if Dean intended to kill Sherry on the day of her death, but it was clear that he "fully intended to strike her" and that his actions caused her death. Doc. 33-5 at 32–33. The court imposed consecutive sentences on each count totaling twenty-five years in prison. Doc. 32 at 6; Doc. 34 at 8.

On May 4, 2021, NYLIC filed a complaint in interpleader to determine the distribution of the Policy's death benefit. Doc. 1 at 5–6. Because Dean was convicted in state court of committing an assault that caused Sherry's death, NYLIC sought to determine alternative beneficiaries to the Policy. Doc. 1 at 4–6. After an investigation, it identified Jeffrey, Sherry's husband at one point, Dean, and Sherry's three children as potential beneficiaries and the defendants in this action. Doc. 1 at 4–6. NYLIC named all five potential beneficiaries as the Defendants, and all were served. Docs. 6, 7, 8, 9, 14. Sherry's sons Trent Wellbaum and Cory Nashtock obtained counsel and answered the complaint, Docs. 13, 20; and Dean wrote a letter filed with the Court answering the complaint. Doc. 12. Jeffrey, and Sherry's son Allen Willey, did not respond to the complaint. Doc. 18; Doc. 29 at 1. The Clerk of Court entered a default judgment against Jeffrey and Allen

for failure to answer or otherwise defend but declined to enter a default judgment against Dean. Doc. 18; Doc. 29 at 1.

NYLIC then brought a Motion for Default Judgment against Jeffrey and Allen and requested to deposit the Policy death benefit with the Clerk of Court, to be dismissed from the action with prejudice, and to receive an award of its reasonable attorneys' fees. Doc. 21. This Court granted the motion and ordered NYLIC to deposit the Policy death benefit with the Clerk of Court and thereafter be dismissed from this action with prejudice. Doc. 29 at 2–3. The Court further ordered that NYLIC could submit a motion for reasonable attorneys' fees and costs accompanied by supporting affidavits and accountings. Doc. 29 at 3. In December 2021, NYLIC deposited the Policy death benefit, including refunded premium and interest from the Policy, totaling $99,849.59 with the Clerk of Court. Doc. 30; Doc. 34 at 2.

Two of the defendants, Trent and Cory, have now filed a Motion for Summary Judgment requesting to split the death benefit. Doc. 31. Dean has responded with several letters to the Court expressing opposition to the motion. Docs. 40, 41, 45, 46. And NYLIC has submitted an unopposed Motion for Attorneys' Fees and Costs. Doc. 36.

**II.     Standard of Review**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials" in his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." Gacek v. Owens & Minor Distribution, Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). To establish that a material fact is genuinely disputed, the party opposing

5

summary judgment must "cit[e] to particular parts of materials in the record" that establish a genuine dispute or "show[] that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1)(A), (B). In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (cleaned up and citation omitted).

### III.  Discussion

Dean has not cited to anything in the record to contest the facts provided by Defendants Cory and Trent and the Plaintiff NYLIC. Therefore, this Court takes the facts provided by Cory, Trent, and NYLIC as true in ruling on the pending motions. See Fed. R. Civ. P. 56(c)(1)(A), (B); D.S.D. Civ. LR 56.1.D.

#### A. Cory and Trent's Motion for Summary Judgment

This is a diversity jurisdiction case under 28 U.S.C. § 1332, where South Dakota law governs the substantive issues. In a diversity case, a federal court is to apply state law and predict how the state supreme court would resolve unsettled issues of state law. Blankenship v. USA Truck, Inc., 601 F.3d 852, 856 (8th Cir. 2010); Jordan v. Safeco Ins. Co. of Illinois, 741 F.3d 882, 887 (8th Cir. 2014).

South Dakota's slayer statute, SDCL § 29A-2-803, is adopted from the Uniform Probate Code § 2-803. It states: "[t]he *felonious and intentional killing* of the decedent: (l) [r]evokes any revocable (i) disposition or appointment of property made by the decedent to the killer in a governing instrument . . ." SDCL § 29A-2-803 (emphasis added). Because this statute pertains to civil claims, "the standard of proof necessary under the South Dakota [law] is a preponderance of the evidence[.]" Matter of Est. of Gibbs, 490 N.W.2d 504, 508 (S.D. 1992); see also UNIF. PROB.

CODE § 2-803 cmt. (revised 2019) ("The concept that a wrongdoer may not profit by his or her own wrong is a civil concept[.]"). Further, "[a]fter all right to appeal has been exhausted, a judgment of conviction establishing criminal accountability for the felonious and intentional killing of the decedent conclusively establishes the convicted individual as the decedent's killer for purposes of [the slayer rule]." UNIF. PROB. CODE § 2-803(g). Under the Uniform Probate Code, a "felonious and intentional killing . . . excludes the accidental manslaughter killing." UNIF. PROB. CODE § 2-803 cmt.

Dean claims that he is entitled to the Policy death benefit because he did not *intend* to kill Sherry. Doc. 12-1 at 1. Dean alleges Sherry would have wanted him to receive the Policy proceeds and that "whether her passing was from jumping out of the moving truck or any altrication [sic] with me is uncertain." Doc. 12-1 at 1. In the event that he is not entitled to the Policy death benefit, Dean states that Sherry would have wanted his special needs adult daughter, Teena Torrence, to receive it. Doc. 12-1 at 1; Doc 45-1 at 2. He states that Sherry and his daughter had a mother-daughter relationship, and Sherry has taken care of Teena over the years. Doc. 12-1 at 1. Cory and Trent respond that South Dakota's slayer statute, SDCL § 29A-2-803, and the Policy forfeiture clause bar Dean from receiving any of the death benefit. Doc. 34 at 9–12.

The Supreme Court of South Dakota has addressed this sort of question in just one case, Matter of Est. of Gibbs, 490 N.W.2d 504 (S.D. 1992). There, the Court applied predecessor statutes[2] to SDCL § 29A-2-803 to bar a beneficiary from inheriting from the decedent having

---

[2] The predecessor statutes applied in Gibbs stated: "Neither the slayer nor any person claiming through him shall in any way acquire any property or receive any benefit as the result of the death of the decedent, but such property shall pass as provided in this chapter." Matter of Est. of Gibbs, 490 N.W.2d at 507 (quoting SDCL 29–9–2 (1984)). "A 'slayer' is defined as 'any person who intentionally and unlawfully takes or procures to be taken the life of another.'" Id. (quoting SDCL 29–9–1 (1984) (cleaned up)).

determined the beneficiary conspired to kill the decedent. Matter of Est. of Gibbs, 490 N.W.2d at 507–08. But the Supreme Court of South Dakota has never addressed whether a beneficiary who, through wrongful conduct, kills the person without any intent to do so has committed a "felonious and *intentional*" killing that revokes the beneficiary's interest in the decedent's property. SDCL § 29A-2-803 (emphasis added). Nonetheless, after reviewing the history and purpose of the slayer rule and authority from other states, this Court determines that SDCL § 29A-2-803 extinguishes Dean's interest in the death benefit based on the undisputed facts in this case.

The slayer rule "is based upon the maxim that no one should be allowed to benefit from his own wrong." Cheatle v. Cheatle, 662 A.2d 1362, 1365 (D.C. 1995) (cleaned up and citation omitted). "The rule was initially applied to circumstances where the slayer killed specifically to inherit from his victim on the theory that killing for greed should not be rewarded. . . . As the rule has developed, it has been expanded to preclude slayers from benefiting from their acts regardless of whether they were economically motivated." In re Est. of Kissinger, 206 P.3d 665, 668 (Wash. 2009) (cleaned up and citation omitted); see also In re Boruch, 505 B.R. 508, 513 (Bankr. W.D. Wis. 2014) (citing Restatement (Third) of Prop.: Wills and Other Donative Transfers § 8.4 cmt.b (2013)) ("The [slayer] rule's purpose is to prevent the enrichment of those who kill others, regardless of motive, on the theory that to permit any benefit to accrue to the killer as a result of a killing would be manifestly unjust."). There is some version of the rule in every state. In re Boruch, 505 B.R. at 514; see also In re Est. of Blodgett, 147 P.3d 702, 707–08 (Alaska 2006) (citation omitted) (discussing how many states have adopted the common-law slayer rule applying to an "individual who feloniously and intentionally kills the decedent" as codified in the Uniform Probate Code). The "application of the slayer rule varies among the states and the interpretation is often policy driven." In re Est. of Kissinger, 206 P.3d at 668.

Applying an ordinary, common definition of "intentional" to SDCL § 29A-2-803 could support a holding that the statute only applies to killers who act with a conscious and deliberate purpose to kill the decedent, such as in cases of first-degree or premeditated murder. See *Intentional*, MERRIAM-WEBSTER, merriam-webster.com/dictionary/intentional (last visited March 15, 2022). Under this narrow interpretation, the slayer statute would not apply to second-degree murder or felony murder cases in which there need not be evidence that the killer acted with the purpose of bringing about the decedent's death. One state, the state of Washington, has adopted such an interpretation of its slayer statute. In New York Life Ins. Co. v. Jones, 541 P.2d 989 (Wash. 1975) (en banc), the Supreme Court of Washington interpreted "intentional" in its slayer statute narrowly referring to the killer's state of mind. In that case, a wife discharged a firearm toward her husband and killed him. 541 P.2d at 990. The wife pled guilty to second-degree felony murder (assault in the second degree) and then sought to obtain the proceeds of her husband's NYLIC's life insurance policy. Id. The Supreme Court of Washington concluded that a second-degree felony murder conviction did not establish proof that the wife "intentionally" killed her husband. Id. at 991. Therefore, the court held that Washington's slayer statute did not bar the wife from receiving her husband's life insurance proceeds unless it was proven that she intended to kill her husband when she assaulted him with a firearm. Id. at 991–92. The Supreme Court of Washington affirmed its analysis in Jones in In re Est. of Kissinger, 206 P.3d 665, 671 (Wash. 2009) (en banc).

But Jones and Est. of Kissinger are in the minority. The majority of courts have interpreted "intentional" in slayer statutes more generally as referring to whether the killer intended to commit those *acts* that caused the decedent's death, regardless of whether the killer's actions were motivated by a desire to kill the decedent. For instance, applying Illinois law, the Seventh Circuit

9

held that "intent" under Illinois' slayer statute "only requires showing that a person intended his or her actions." Laborers' Pension Fund v. Miscevic, 880 F.3d 927, 936 (7th Cir. 2018). Similarly, the Supreme Court of Virginia has held that "[i]ntent in a civil context only requires that a person intended his actions" and that criminal intent is irrelevant. Osman v. Osman, 737 S.E.2d 876, 880 (Va. 2013). In applying the slayer rule to all forms of murder, a Michigan court explained that "the origins of the 'slayer rule' support that it is broad and incorporated all forms of murder. . . . '[F]eloniously and intentionally kill' [as written in state statute] . . . was clearly intended to apply broadly and incorporate second-degree murder." In re Est. of Mikes, 2015 WL 1227593, at *4 (Mich. Ct. App. Mar. 17, 2015). See also In re Est. of Blodgett, 147 P.3d at 707, 707 n.34–35 (explaining that some states have even extended their slayer statutes to include unlawful but "unintentional" killing); In re Hamilton, 446 So. 2d 463, 464–65 (La. Ct. App.) (applying Louisiana law to hold that a slayer convicted of unintentional manslaughter was barred from recovering the decedent's life insurance proceeds); Quick v. United Ben. Life Ins. Co., 213 S.E.2d 563, 569–70 (N.C. 1975) (holding that a slayer convicted of involuntary manslaughter was "disqualified from receiving any insurance proceeds . . . since the killing, although unintentional, nonetheless resulted from her culpable negligence" under common law principles).

This Court predicts that the Supreme Court of South Dakota would follow the reasoning of courts that interpret "intentional" as applied in slayer statutes to refer to whether a killer's actions were voluntary, rather than to the killer's state of mind. This interpretation of "intentional" is also aligned with the purpose of the slayer rule— "to prevent the wrongdoer from profiting from the wrong"— which certainly applies to all types of murder cases. Restatement (Third) of Property § 8.4 cmt. (f). A narrower interpretation of "intentional" that only applies to premediated killings

would defeat the purpose of slayer statutes and be manifestly unjust.[3]  Indeed, the comment to Uniform Probate Code § 2-803 recognizes that "the accidental manslaughter killing" is excluded from § 2-803 and that the word "intentional" is not meant in the criminal sense to require proof of a first-degree murder.  The comment provides:

> [T]his section is confined to felonious and intentional killing and excludes the accidental manslaughter killing. . . .  [A] judgment of conviction establishing criminal accountability for the felonious and intentional killing of the decedent conclusively establishes the convicted individual as the decedent's killer for purposes of this section. Acquittal, however, does not preclude the acquitted individual from being regarded as the decedent's killer for purposes of this section. This is because different considerations as well as a different burden of proof enter into the finding of criminal accountability in the criminal prosecution. Hence it is possible that the defendant on a murder charge may be found not guilty and acquitted, but if the same person claims [an entitlement to inherit, the court] . . . may find that, under a preponderance of the evidence standard, he or she would be found criminally accountable for the felonious and intentional killing of the decedent and thus be barred under this section from sharing in the affected property.

UNIF. PROB. CODE § 2-803 cmt.

Here, there is no genuine dispute that Dean beat Sherry to death and was subsequently convicted on felony assault charges.  Sherry's head was black and blue, she was missing teeth, she

---

[3] The Restatement (Third) of Property adopts a yet another definition of intentional, stating that a killing is "intentional" so long as the killer "knows to a substantial certainty" that death may result from his or her actions. Restatement (Third) of Property § 8.4 cmt. (f). *"The term "intentional" is not confined to consequences that the actor has the purpose of producing, but includes consequences that the actor knows to a substantial certainty will ensue from the actor's conduct."* Id. (citing Restatement Third, Torts: Liability for Physical Harm (Basic Principles) § 1 (Tentative Draft No. 1, 2001)) (emphasis added). The Restatement also distinguishes "intentional" killings from killings caused by an accident or negligent conduct: "[t]he slayer rule does not apply if the killing was reckless, accidental, or negligent.  A killing is reckless when the actor knows of the risk of harm created by the conduct or knows facts that make that risk obvious to a reasonable person in that situation, and the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the failure to adopt the precaution a demonstration of indifference to the risk." Id. Moreover, the Restatement provides that "[t]he terms 'felonious' and 'intentional' [as applied in slayer statutes] should be defined in light of the public policy to which the slayer rule is directed—to prevent the wrongdoer from profiting from the wrong." Restatement (Third) of Property § 8.4 cmt. (f).

11

had bite marks, and her torso and arms were bruised. Doc. 32 at 4; Doc. 33-5 at 31–32. Even by Dean's own account, after Sherry jumped out of the truck, he exchanged blows with her beside the highway and pulled her back inside the truck and drove home. Doc. 33-5 at 36. Sherry's death was ruled a homicide due to "subdural hemorrhage, blunt force injury of head, assault." Doc. 32 at 2; Doc. 34 at 2. By his own admission, Dean also did not seek medical care for Sherry until hours after he brutally assaulted her. Doc. 33-5 at 36. Later he told officers that he had killed her. Doc. 33-5 at 40; Doc. 43 at 4. On these facts, there is enough evidence to meet the preponderance of the evidence threshold as a matter of law that Dean acted intentionally when he beat Sherry, that he thereby willfully brought about her killing, and that the killing was felonious. Therefore, Dean is barred from receiving the Policy's death benefit under the Policy language[4] and under SDCL § 29A-2-803.

### B. NYLIC's Motion for Attorneys' Fees and Costs

It is well-established that a "completely disinterested stakeholder should not ordinarily be out of pocket for the necessary expenses and attorney's fees incurred by him, [although] the amount allowed for such fees should be modest." Federated Mut. Ins. Co. v. Moody Station & Grocery, 821 F.3d 973, 979 (quoting Hunter v. Fed. Life Ins. Co, 111 F.2d 551, 557 (8th Cir. 1940)); see also Dusseldorp v. Ho, 4 F. Supp. 3d 1069, 1070 (S.D. Iowa 2014); 7 Mary Kay Kane, Federal Practice and Procedure § 1719 (3d ed.), Westlaw (April 2021 Update). "The court has discretion to award reasonable attorneys' fees to a stakeholder in an interpleader action from the funds deposited in the registry of the court." Hartford Life & Acc. Ins. Co. v. Rogers, No. 3:13-CV-101, 2014 WL 4980891, at *3 (D.N.D. Oct. 3, 2014) (citing N.Y. Life Ins. Co. v. Miller, 139 F.2d 657,

---

[4] The Policy's forfeiture clause disqualifies a beneficiary who has been determined to have "willfully br[ought] about the INSURED's death." Doc. 34 at 10.

658 (8th Cir. 1944)); see also Federated Mut. Ins. Co., 821 F.3d at 979 (cleaned up and citation omitted) ("The decision to award attorney fees rests within the sound discretion of the district court . . .").

NYLIC requests a partial attorneys' fees award of $10,000 out of a total $15,283.18 in incurred fees and costs and has submitted a detail accounting of the fees and costs incurred. Doc. 36 at 1; Doc. 37-1; Doc. 38-1. For local counsel, the amount incurred consisted of $1993.68 in attorneys' fees charged at a billable rate of $240 per hour. Docs. 37 at 2; Doc. 37-1. For out-of-state counsel, the amount incurred consisted of $12,987.50 in fees charged at a billable rate of $300 per hour. Doc. 38 at 2; Doc. 38-1. NYLIC contends that this action required more investigation than a run-of-the mill case because of the circumstances of Sherry's death. Doc. 36 at 2. Counsel for NYLIC had to investigate Dean's criminal records and plea agreement prior to bringing the complaint. Doc. 36 at 2. NYLIC's counsel also reviewed estate proceedings to identify and then locate Sherry's potential heirs because the Policy did not list any contingent beneficiaries. Doc. 36 at 2–3. Cory and Trent do not object to NYLIC's motion for partial attorneys' fees. Doc. 42.

Having reviewed NYLIC's detailed accounting of the work performed and pleadings in this case, this Court determines attorneys' fees in the amount of $10,000.00 are reasonable. See E.R. v. Minnesota Life Ins. Co., No. 2:18 CV 31 CDP, 2019 WL 1532895, at *1 (E.D. Mo. Apr. 9, 2019) (awarding $9,050 in attorney's fees in an interpleader action upon finding a detailed accounting of the work performed).

## IV. Conclusion and Order

For the reasons discussed, it is hereby

ORDERED that Defendants Cory Nashtock and Trent Wellbaum's Motion for Summary Judgment, Doc. 31, is granted. It is further

ORDERED that NYLIC's Motion for Attorney Fees and Costs, Doc. 36, is granted and that the Clerk of Court is directed to pay to NYLIC $10,000 from the death benefit proceeds deposited with the registry of the Court. It is finally

ORDERED that the Clerk of Court is to pay the remaining balance of the death benefit proceeds one-half to Defendant Trent Wellbaum and one-half to Defendant Cory Nashtock through their counsel of record.

DATED this 22nd day of March, 2022.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE